## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN JACKSON AND SHARON JACKSON, HIS WIFE,** | **CIVIL ACTION NO.**    3:18-cv-81 |
| **PLAINTIFFS,** | **JURY TRIAL DEMANDED** |
| v. | **ELECTRONICALLY FILED** |
| **ERNEST P. JONES, M.D., ROBERT R. COLL, M.D., RICHARD G. WILLIAMS, M.D., AND PENN HIGHLANDS CLEARFIELD HOSPITAL,** | |
| **DEFENDANTS.** | |

### COMPLAINT IN CIVIL ACTION

AND NOW, come Plaintiffs, Steven Jackson and Sharon Jackson, his wife, by and through their attorneys, George R. Farneth II, Esquire and The Farneth Law Group, LLC and file this Complaint in Civil Action, averring as follows:

### THE PARTIES

1.      Plaintiffs, Steven Jackson ("Mr. Jackson") and Sharon Jackson ("Mrs. Jackson") are adult individuals who, at all times pertinent hereto, were husband and wife and resided at 229 Sand Run Rd., Akron, Ohio, 44313.  Mr. Jackson and Mrs. Jackson will sometimes hereinafter be collectively referred to as "Plaintiffs."

2.      Defendant, Ernest P. Jones, M.D. ("Dr. Jones") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine and was duly licensed for such practice under the laws of the Commonwealth of Pennsylvania and who maintained a principal place of business located at 809 Turnpike Avenue, Clearfield, Clearfield County, Pennsylvania 16830.

1

3.      Defendant, Robert R. Coll, M.D. ("Dr. Coll") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine and was duly licensed for such practice under the laws of the Commonwealth of Pennsylvania and who maintained a principal place of business located at 809 Turnpike Avenue, Clearfield, Clearfield County, Pennsylvania 16830.

4.      Defendant, Richard G. Williams, M.D. ("Dr. Williams") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine and was duly licensed for such practice under the laws of the Commonwealth of Pennsylvania and who maintained a principal place of business located at 809 Turnpike Avenue, Clearfield, Clearfield County, Pennsylvania 16830.

5.      Defendant, Penn Highlands Clearfield Hospital ("Hospital") is a medical institution which, at all times pertinent hereto, maintained a principal place of business located at 100 Hospital Avenue, Dubois, Clearfield County, Pennsylvania 15801

6.      Dr. Jones, Dr. Coll, Dr. Williams, and Hospital will sometimes hereinafter be collectively referred to as "Defendants."

7.      At all times pertinent hereto, Hospital was acting by and through its authorized agents, servants, employees, representatives, staff members, and ostensible agents, including but not limited to Dr. Jones, Dr. Coll, Dr. Williams, Liza Baxter, RN ("Baxter"), and other members of Hospital's medical and surgical staff who participated in the medical care and treatment that was rendered to Mr. Jackson in August 2016, all of whom were then and there acting within the course and scope of their employment or apparent employment with and in furtherance of the business operations of Hospital and for the financial gain and benefit of all Defendants.

8.     At all times pertinent hereto, Dr. Jones held out to the general public, including Plaintiffs, that he was a member in good standing of the medical community and was a skilled and competent specialist in the field of emergency medicine.

9.     At all times pertinent hereto, Dr. Coll held out to the general public, including Plaintiffs, that he was a member in good standing of the medical community and was a skilled and competent specialist in the field of internal medicine.

10.     At all times pertinent hereto, Dr. Williams held out to the general public, including Plaintiffs, that he was a member in good standing of the medical community and was a skilled and competent specialist in the field of radiology.

11.     At all times pertinent hereto, Baxter held out to the general public, including Plaintiffs, that she was a member in good standing of the medical community and was a skilled and competent registered nurse.

12.     At all times pertinent hereto, Hospital held out to the general public, including Plaintiffs, that it was a skilled and competent medical institution and that Dr. Jones, Dr. Coll, Dr. Williams, and Baxter were members in good standing of the medical community and were skilled and competent physicians and/or nurse and that its medical staff who participated in the medical care and treatment that was rendered to Mr. Jackson in August 2016 were skilled and competent and would provide patients, including Mr. Jackson, with quality medical care and treatment.

13.     Based upon the representations made by Defendants as to their skill and competency, at all times pertinent hereto, Plaintiffs relied upon Defendants to render full, complete, accurate, and competent medical care and treatment to Mr. Jackson that met or exceeded all applicable standards of care.

14.     Defendants, for good and valuable compensation and other consideration which Plaintiffs agreed to pay, did pay, and/or that was paid on their behalf, undertook and agreed to care for Mr. Jackson and to perform all reasonable and necessary medical and surgical procedures and to use all requisite, reasonable, necessary, and proper skills and judgment in rendering such medical and surgical care and treatment.

15.     Plaintiffs are asserting professional negligence claims against each of the Defendants.

## JURISDICTION AND VENUE

16.     Plaintiffs are citizens of the State of Ohio and Defendants are citizens of the Commonwealth of Pennsylvania.

17.     The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.5.

18.     Venue in this Honorable Court is proper in accordance with the provisions of 28 U.S.C. §1391, in that all the claims set forth herein arose in the Western District of Pennsylvania and Defendants reside in the Western District of Pennsylvania.

## BACKGROUND/FACTUAL HISTORY

19.     On August 28, 2016 Plaintiffs were involved in a serious roll-over motor vehicle accident.

20.     Mr. Jackson, who was the front seat passenger in the vehicle, was thrown into the back seat and had to be extricated.

21.     Because of his appearance and complaints of multifocal areas of pains, including his head and neck, the EMS personnel who treated Mr. Jackson at the scene recognized he was

4

seriously injured and immediately applied a cervical hard collar, placed him on a backboard, and emergently transported him to Hospital.

22.     Plaintiffs were not consulted and had no input whatsoever into the decision to transport Mr. Jackson to Hospital as opposed to some other medical facility and specifically a tertiary care facility.

23.     Likewise, Plaintiffs were not consulted and had no input whatsoever into the decisions as to what medical personnel would examine and treat Mr. Jackson at Hospital; rather, all such decisions were made by Defendants.

24.     Upon his arrival in Hospital's Emergency Department, Mr. Jackson was seen by triage nurse, Baxter who noted, inter alia, a 3 cm laceration above Mr. Jackson's left eye and bilateral neck tenderness; however, she failed to perform a full, detailed neurological exam.

25.     Mr. Jackson was next seen by Dr. Jones who noted decreased movement in Mr. Jackson's left lower extremity due to pain and weakness, pain upon movement of his upper extremities, and pain in his shoulders on light touching; however, Dr. Jones also failed to perform or order a full, detailed neurological exam.

26.     A cervical CT Scan was read by Dr. Williams as showing "advanced multisegment degenerative disc disease at the mid and lower cervical spine levels with bilateral foraminal encroachment from osteophytes at several sites, including C5-C6 and C6-C7," but no acute fracture was identified.

27.     Based upon the results of the CT Scan as interpreted by Dr. Williams, Dr. Jones removed Mr. Jackson's cervical hard collar and took him off the backboard.

28.     At Defendants' direction, Mr. Jackson got out of bed to walk, but he was unable to weight bear because his left leg buckled.

29.     Mr. Jackson reported that his whole left side and portions of his right side were weaker than normal.

30.     Although he noted that Mr. Jackson was having weakness of his left lower extremity, he concluded that his "work-up is essentially unremarkable" and that he was "unsure" of the cause of the weakness.

31.     Dr. Jones planned to admit Mr. Jackson to Hospital for observation and MRI Scans to be done "later today;" amazingly however in his differential diagnosis, Dr. Jones did not include any cervical injury.

32.     Mr. Jackson was admitted to Hospital under the care of Dr. Coll who first saw Mr. Jackson on August 29, 2016.

33.     Dr. Coll noted the weakness in Mr. Jackson's left leg; however, he too failed to perform or order a full, detailed neurological exam.

34.     Even though Dr. Coll noted that Mr. Jackson was "having difficulty ambulating due to left lower extremity weakness related to the injuries suffered in the MVA (motor vehicle accident)" and knew or should have known Mr. Jackson had suffered a severe, traumatic cervical injury, he ordered physical therapy for Mr. Jackson.

35.     At Defendants' direction, Mr. Jackson was mobilized out of bed and evaluated by physical therapy who noted the continued weakness of the left leg but referred examination of Mr. Jackson's upper extremities to occupational therapy who never saw Mr. Jackson and, as a result, his upper extremities were never evaluated.

36.     Mr. Jackson became progressively weaker on his left side and portions of his right side.

37.     Despite clear indications Mr. Jackson had sustained a severe, traumatic cervical injury, Defendants failed to order on a stat basis additional diagnostic studies, failed to promptly initiate the medical care and treatment necessitated by Mr. Jackson's condition, and failed to promptly transfer Mr. Jackson to a tertiary care facility that was much more capable of accurately diagnosing and treating Mr. Jackson's injuries under the circumstances.

38.     It was not until August 30, 2016 that the cervical, thoracic and lumbar MRIs were finally performed.

39.     The cervical MRI was read as showing evidence of a "combination of anterior and posterior ligamentous injury" which "may lead to instability" with evidence of a cord contusion from the level of C3 through C6-7."

40.     Based upon the results of the cervical MRI Defendants finally recognized the need to reapply a cervical spine collar and transfer Mr. Jackson to UPMC-Mercy Hospital ("UPMC") for neurologic and neurosurgical evaluation.

41.     Upon arrival at UPMC, Mr. Jackson was promptly seen by the neurological staff, including David L. Kaufmann, M.D. ("Dr. Kaufmann") and was noted to have mild to moderate weakness of his bilateral upper extremities, left greater than right, and of his left lower extremity with intact strength in his right lower extremity.

42.     A review of Mr. Jackson's diagnostic studies revealed multi-level severe spinal stenosis of his cervical spine with evidence of spinal cord injury.

43.     On August 31, 2016 Mr. Jackson underwent a C3-T1 posterior cervical decompression and fusion with instrumented stabilization which was performed by Dr. Kaufmann.

44.     Postoperatively Mr. Jackson's neurological exam was essentially unchanged, and he continued to have weakness and gait difficulty.

7

45.    Mr. Jackson was transferred to the Mercy Spinal Cord Injury rehabilitation unit.

46.    While on the rehabilitation unit Mr. Jackson suffered wound dehiscence with possible infection for which he was taken back to the operating room for the performance of an irrigation and debridement procedure with placement of a wound VAC.

47.    Mr. Jackson was finally discharged home on October 25, 2016.

48.    On December 8, 2016 Mr. Jackson was noted to be improving neurologically but remained with significant weakness of his left and right upper and left lower extremities which require that he use a cane to ambulate.

49.    Mr. Jackson was also complaining of neuropathic pain in his trunk and upper extremities.

50.    Dr. Kaufmann recommended that Mr. Jackson continue with physical therapy.

51.    On October 5, 2017, Dr. Kaufmann noted that Mr. Jackson was continuing to experience left-sided weakness and difficulty with ambulation and mobility, as well as neck pain and fatigue of his cervical muscles with difficulty holding his head up at times and continued neuropathic pain.

52.    A CT Scan demonstrated some loss of his cervical lordosis and mild forward sagittal balance.

53.    On October 26, 2017, Mr. Jackson reported to Dr. Kaufmann that his continued pain, weakness and difficulty with mobility were greatly affecting his quality of life and he was no longer able to do many activities he previously enjoyed which was negatively affecting his mood.

54.     As a sole, direct, proximate, and legal result of Defendants' individual and collective conduct as aforesaid, Mr. Jackson has suffered the following severe, serious and likely permanent injuries, damages, losses, and harm:

   a.     His spinal cord injury worsened;

   b.     His neurologic condition worsened;

   c.     He has left-sided weakness and decreased mobility;

   d.     He has right upper extremity weakness and decreased mobility;

   e.     He has suffered and will continue to suffer increased pain, weakness and difficulty with mobility;

   f.     His ability to perform his regular daily activities has been drastically affected;

   g.     He has had to undergo significant medical and surgical care and treatment, including diagnostic tests, studies, invasive procedures, and physical and occupational therapy;

   h.     He has been and will be required to expend large sums of money for medical and surgical attention, hospitalizations, medical supplies, surgical appliances, medicines, and attendant services;

   i.     He has suffered a markedly increased risk of harm and/or risk of future complications, including a diminished opportunity to survive;

   j.     He has suffered permanent scaring and disfigurement;

   k.     He has suffered and/or in the future will suffer great pain, suffering, inconvenience, embarrassment, and mental anguish;

   l.     His general health, strength and vitality have been impaired;

   m.     He has suffered a substantial loss of the enjoyment of the ordinary pleasures and quality of life;

   n.     He has suffered and/or may suffer a loss of earnings and/or an impairment of his earning capacity;

   o.     He has suffered a substantial a loss of independence as a result of his injuries;

p.    His ability to obtain and maintain health insurance coverage has been and/or may be impaired; and

q.    His relationship with his wife and family has been severely affected.

## COUNT I

## PLAINTIFFS v DEFENDANTS, ERNEST P. JONES, M.D., ROBERT R. COLL, M.D., AND RICHARD G. WILLIAMS, M.D.

## NEGLIGENCE/PROFESSIONAL MALPRACTICE

55.    Plaintiffs incorporate herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 54 above.

56.    Plaintiffs' severe, serious and likely permanent injuries, damages, losses, and harm as aforesaid were the sole, direct, proximate, and legal result of the carelessness, recklessness, negligence, malpractice and deviation from the standard of care by Dr. Jones, Dr. Coll and Dr. Williams, generally and in the following particulars:

a.    In failing to understand and appreciate that Mr. Jackson had suffered a severe, traumatic cervical spinal cord injury;

b.    In failing to understand and appreciate the extent and severity of Mr. Jackson's traumatic cervical spinal cord injury;

c.    In failing to properly and timely diagnose, treat and manage Mr. Jackson's medical condition;

d.    In failing to immediately refer and transport Mr. Jackson to a tertiary care facility where he could promptly receive the medical care and treatment he needed;

e.    In failing to accurately read and interpret the cervical CT Scan that was performed on Mr. Jackson;

f.    In failing to timely order and have performed a cervical MRI and/or myelogram and other testing;

g.    In removing Mr. Jackson's cervical collar when removing it was contra-indicated;

h.      In failing to immediately reapply Mr. Jackson's cervical collar;

i.      In ordering Mr. Jackson to get out of bed and ambulate when doing so was contra-indicated;

j.      In ordering physical therapy for Mr. Jackson when physical therapy was contra-indicated;

k.      In causing a significant worsening of Mr. Jackson's cervical spinal cord injury;

l.      In failing to properly and thoroughly assess Mr. Jackson's condition following the automobile accident;

m.      In failing to follow and comply with the policies, procedures and protocols established by Hospital;

n.      In failing to inform and warn Plaintiffs there was a risk Mr. Jackson's condition would worsen as a result of the care and treatment Defendants were rendering;

o.      In failing to take necessary and appropriate precautions to ensure Mr. Jackson's condition did not worsen;

p.      In causing and/or increasing Mr. Jackson's pain, weakness and difficulty with mobility;

q.      In failing to properly and adequately monitor, assess and treat Mr. Jackson's condition;

r.      In failing to timely order and have performed all the follow-up diagnostic tests, studies and other procedures that were necessary to investigate Mr. Jackson's clinical presentation and the information provided and complaints expressed by Mr. Jackson;

s.      In failing to include cervical injury in their differential diagnosis;

t.      In failing to thoroughly work-up Mr. Jackson for cervical injury;

u.      In failing to timely order and have performed consultations with and/or interventions by medical specialists who possessed the requisite education, training, knowledge, skill and expertise necessary to properly and timely diagnose and treat Mr. Jackson's condition;

v.      In failing to inform Plaintiffs that they lacked the education, training, knowledge, skill and expertise necessary to properly diagnose and treat Mr. Jackson's condition;

w.   In failing to ensure that Mr. Jackson received the proper and necessary medical and surgical care and treatment his condition required under the circumstances;

x.   In failing to fully, properly and appropriately advise Plaintiffs of the exact nature of Mr. Jackson's medical condition and the medical and surgical care and treatment that was necessary to properly treat that condition;

y.   In failing to possess the requisite education, training, knowledge, skill, and expertise that was necessary to diagnose and treat Mr. Jackson's condition;

z.   In failing and neglecting to take proper and sufficient precautions to make certain that Mr. Jackson's condition was timely and properly diagnosed and treated;

aa.   In causing Mr. Jackson to suffer an increased risk of harm;

bb.   In causing Mr. Jackson to suffer an increased risk of complications and further injuries, including a diminished opportunity to survive;

cc.   In causing Mr. Jackson to suffer great pain, suffering, inconvenience, embarrassment and mental anguish;

dd.   In failing to inform and warn Plaintiffs of their aforementioned acts and/or omissions; and

ee.   In failing to adhere to and provide medical care and treatment to Plaintiffs in accordance with the standard of care within the medical community in which they practice.

57.   As a sole, direct, proximate, and legal result of the carelessness, recklessness, negligence, malpractice and deviation from the standard of care by Defendants as aforesaid, Plaintiffs have suffered and will continue to suffer the aforementioned severe, serious and likely permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiffs, Steven Jackson and Sharon Jackson, demand judgment in their favor and against Defendants, Ernest P. Jones, M.D., Robert R. Coll, M.D., and Richard G. Williams, M.D. in an amount in excess of seventy-five thousand dollars ($75,000.00), together with interest, costs, and such other relief as this Honorable Court deems appropriate.

## COUNT II

## PLAINTIFFS v DEFENDANT, PENN HIGHLANDS CLEARFIELD HOSPITAL
### NEGLIGENCE/CORPORATE LIABILITY/VICARIOUS LIABILITY

58.     Plaintiffs incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 57 above.

59.     Plaintiffs' severe, serious and likely permanent injuries, damages, losses, and harm as aforesaid were the sole, direct, proximate, and legal result of the carelessness, recklessness, negligence, malpractice and deviation from the standard of care of Hospital, corporately and by and through its authorized agents, servants, employees, representatives, staff members and ostensible agents, including but not limited to Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other members of its medical staff who participated in the medical care and treatment that was rendered to Mr. Jackson in August 2016, generally and in the following particulars:

a.     In holding out Dr. Jones, Dr. Coll, Dr. Williams, and Baxter to the general public and specifically Plaintiffs as skilled medical specialists;

b.     In selecting and assigning Dr. Jones, Dr. Coll, Dr. Williams, and Baxter to provide medical and surgical care and treatment to Mr. Jackson;

c.     In failing to hire, employ and maintain staff that possessed the requisite education, knowledge, training, skill and expertise to properly diagnose and treat Mr. Jackson' condition;

d.     In assigning and/or permitting Dr. Jones, Dr. Coll, Dr. Williams, and Baxter to examine and treat Mr. Jackson when it knew or should have known that they did not possess the requisite education, knowledge, training, skill, and expertise necessary to properly care for and treat Mr. Jackson;

e.     In failing to properly educate, train, instruct, and supervise their medical staff members, including Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other members of its medical staff who participated in the medical care and treatment that was rendered to Mr. Jackson in August 2016;

f.     In granting Dr. Jones, Dr. Coll and Dr. Williams staff privileges and holding out to the general public that they were members in good standing in the medical community and were skilled and competent medical specialists;

13

g.   In failing to properly supervise, direct and/or monitor the medical care and treatment that Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members provided to Mr. Jackson;

h.   In failing to formulate, adopt and enforce adequate rules, regulations, policies, and procedures to ensure that Mr. Jackson received all the medical care, treatment and procedures that were necessary under the circumstances;

i.   In failing to formulate, adopt and enforce adequate rules, regulations, policies, and procedures that would have required the frequent and timely assessment of Mr. Jackson's condition;

j.   In failing to require that Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson followed and complied with the rules, regulations, policies, procedures, and protocols that Hospital did formulate and adopt relative to patients like Mr. Jackson;

k.   In failing to require that its agents, servants, employees, representatives, staff members, other health care providers and ostensible agents reported the deficient, negligent, inadequate, and substandard medical care and treatment that Mr. Jackson received from Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members to supervisory and/or administrative staff who could contact consultants, specialists and/or experts to ensure that Mr. Jackson received the quality care to which he was entitled;

l.   In failing to control the conduct of its staff members, including Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson thereby rendering it negligent under principles of respondeat superior, with the negligence of their agents, servants, employees, representatives, staff members and other health care providers being automatically imputed to them;

m.   In holding out to the general public, including Plaintiffs, its staff members, including Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson as being their agents, servants, employees and/or representatives and in allowing the perception to be created that Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson, even if otherwise independent contractors, thereby rendering it liable to Plaintiffs under principles of ostensible agency, particularly with respect to the acts and/or omissions as more specifically set forth herein;

n.   In failing to understand and appreciate that Mr. Jackson suffered a severe, traumatic cervical spinal cord injury;

o.   In failing to understand and appreciate the extent and severity of Mr. Jackson's traumatic cervical spinal cord injury;

14

p.     In failing to properly and timely diagnose, treat and manage Mr. Jackson's medical condition;

q.     In failing to immediately refer and transport Mr. Jackson to a tertiary care facility where he could promptly receive the medical care and treatment he needed;

r.     In failing to accurately read and interpret the cervical CT Scan that was performed on Mr. Jackson;

s.     In failing to timely order and have performed a cervical MRI and/or myelogram;

t.     In allowing Mr. Jackson's cervical collar to be removed when removing it was contra-indicated;

u.     In failing to require that Mr. Jackson's cervical collar be immediately reapplied;

v.     In allowing Mr. Jackson to get out of bed and ambulate when doing so was contra-indicated;

w.     In allowing physical therapy to be ordered for Mr. Jackson when physical therapy was contra-indicated;

x.     In causing a significant worsening of Mr. Jackson's cervical spinal cord injury;

y.     In failing to properly and thoroughly assess Mr. Jackson's condition following the automobile accident;

z.     In failing to require that its medical staff follow and comply with the policies, procedures and protocols it established;

aa.     In failing to inform Plaintiffs there was a risk Mr. Jackson's condition would worsen as a result of the care and treatment Defendants were rendering;

bb.     In failing to take necessary and appropriate precautions to ensure Mr. Jackson's condition did not worsen;

cc.     In causing Mr. Jackson's condition to worsen;

dd.     In causing and/or increasing Mr. Jackson's pain, weakness and difficulty with mobility;

ee.     In failing to properly and adequately monitor, assess and treat Mr. Jackson's condition;

ff.    In failing to timely order and have performed all the follow-up diagnostic tests, studies and other procedures that were necessary in order to investigate Mr. Jackson's clinical presentation and the information provided and complaints expressed by Mr. Jackson;

gg.    In failing to thoroughly work-up Mr. Jackson for cervical injury;

hh.    In failing to properly and thoroughly assess Mr. Jackson's condition;

ii.    In failing to follow and comply with the policies, procedures and protocols it established or should have established;

jj.    In failing to ensure that its medical staff followed and complied with the policies, procedures and protocols it established or should have established;

kk.    In failing to take necessary and appropriate precautions to ensure Mr. Jackson's condition did not deteriorate;

ll.    In failing to timely, accurately and properly diagnose and treat Mr. Jackson's medical condition;

mm.    In failing to timely, accurately and properly act upon the information supplied and complaints expressed by Mr. Jackson;

nn.    In failing to timely, accurately and properly act upon the diagnostic tests, studies, laboratory results and other clinical information which indicated that there was a strong likelihood that Mr. Jackson had suffered a severe cervical spinal cord injury;

oo.    In failing to timely order and have performed all the necessary follow-up diagnostic tests, studies and procedures necessary to investigate Mr. Jackson's clinical presentation and the information provided and complaints expressed by Mr. Jackson;

pp.    In failing to inform Mr. Jackson that he had suffered a severe cervical spinal cord injury;

qq.    In failing to timely order and have performed consultations with and/or interventions by medical specialists who possessed the requisite education, training, knowledge, skill, and expertise necessary to properly and timely diagnose and treat Mr. Jackson's condition;

rr.    In failing to inform Plaintiffs that Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson lacked the education, training, knowledge, skill, and expertise necessary to properly diagnose and treat Mr. Jackson's condition;

16

ss.     In failing to ensure Mr. Jackson received the proper and necessary medical and surgical care and treatment his condition required under the circumstances;

tt.     In failing to fully, properly and appropriately advise Plaintiffs of the exact nature of Mr. Jackson's medical condition and the medical and surgical care and treatment that was necessary to properly treat that condition;

uu.     In failing and neglecting to take proper and sufficient precautions to make certain Mr. Jackson's condition was timely and properly diagnosed and treated and did not deteriorate;

vv.     In causing Mr. Jackson to suffer an increased risk of harm;

ww.     In causing Mr. Jackson to suffer an increased risk of complications and further injuries, including a diminished opportunity to survive;

xx.     In causing Mr. Jackson to suffer great pain, suffering, inconvenience, embarrassment and mental anguish;

yy.     In failing to inform Plaintiffs of its aforementioned acts and/or omissions; and

zz.     In failing to adhere to and provide medical care and treatment to Mr. Jackson in accordance with the standard of care within the medical community in which they practice.

60.     As a sole, direct, proximate, and legal result of the carelessness, recklessness, negligence, malpractice and deviation from the standard of care of Hospital, generally and by its authorized agents, servants, employees, representatives, staff members, and ostensible agents, including but not limited to Dr. Jones, Dr. Coll, Dr. Williams, Baxter, and the other medical staff members who cared for Mr. Jackson, Plaintiffs have suffered and will continue to suffer the aforementioned severe, serious and likely permanent injuries, damages, losses and harm.

WHEREFORE, Plaintiffs, Steven Jackson and Sharon Jackson, demand judgment in their favor and against Defendant, Penn Highlands Clearfield Hospital in an amount in excess of seventy-five thousand dollars ($75,000.00), together with interest, costs, and such other relief as this Honorable Court deems appropriate.

## COUNT III

## PLAINTIFF, SHARON JACKSON V. DEFENDANTS
## LOSS OF CONSORTIUM

61.     Plaintiffs incorporate herein by reference as though fully set forth at length paragraphs 1 through 60 above.

62.     At all times pertinent hereto, Plaintiffs were and still are married and cohabitating as husband and wife.

63.     As a sole, direct, proximate, and legal result of Defendants' negligent, careless, and reckless actions and inactions as aforesaid, Mrs. Jackson has suffered a loss of Mr. Jackson's love, affection, support, companionship, assistance, society, consortium, and services which she previously enjoyed.

64.     As a sole, direct, proximate, and legal result of Defendants' negligent, careless, and reckless actions and inactions as aforesaid, Mrs. Jackson has incurred and, in the future, will incur significant medical, hospital and other treatment related bills and out-of-pocket expenses for and/or on behalf of Mr. Jackson all in an effort to care for and help her husband, Mr. Jackson, treat and recover from the injuries he sustained as a result of Defendants' conduct.

WHEREFORE, Plaintiffs, Steven Jackson and Sharon Jackson, demand judgment in their favor and against Defendants, Ernest P. Jones, M.D., Robert R. Coll, M.D., Richard G. Williams, M.D., and Penn Highlands Clearfield Hospital in an amount in excess of seventy-five thousand dollars ($75,000.00), together with interest, costs, and such other relief as this Honorable Court deems appropriate.

Respectfully Submitted,

**THE FARNETH LAW GROUP, LLC**

By: _____
GEORGE R. FARNETH II, ESQUIRE
*Attorneys for Plaintiffs,*
*Steven Jackson and Sharon Jackson*